# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| SYLVANUS OGBURIA, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **Case No.: 5:06-CV-2275-VEH** |
| | ) |
| ALABAMA AGRICULTURAL & | ) |
| MECHANICAL UNIVERSITY, et | ) |
| al., | ) |
| | ) |
| **Defendants.** | ) |

---

## MEMORANDUM OPINION

## I.    INTRODUCTION

Before the Court are cross-motions for summary judgment.  The Defendants[1] filed their Motion for Summary Judgment (Doc. 57) on January 12, 2009, seeking dismissal of all claims brought against them.  The Plaintiff filed his Motion for Partial Summary Judgment (Doc. 60), also on January 12, 2009, seeking summary judgment on the issue of liability under 42 U.S.C. § 1983.

---

[1] The remaining Defendants in this case are Jesse Cleveland, Hall Bryant, Jr., Martha Lynn Sherrod, Clinton Johnson, Sr., H. Lewis Gillis, Richard Davis, Robert Holmes, Jr., Jeannette Jones, Emma Melton, Velma Tribue, and Oliver Washington III, sued in their official capacities as Trustees of Alabama Agricultural & Mechanical University ("the Board of Trustees"), and Dr. Robert Jennings, sued in both his individual capacity and his official capacity as President of Alabama Agricultural & Mechanical University ("Jennings").

This case arises out of the Plaintiff's termination from his position as a tenured professor at Alabama Agricultural & Mechanical University ("The University"). Ogburia was terminated for alleged sexual harassment, and he now claims that he was improperly terminated, in violation of both state and federal law.

As discussed in greater detail in the opinion below, the Defendants' motion for summary judgment is due to be granted with respect to the Plaintiff's pre-termination due process claims, since the undisputed facts establish that Ogburia received all of the process to which he was entitled prior to his termination. Ogburia's motion for partial summary judgment is due to be granted as to his post-termination due process claims with respect to each of the members of the Board of Trustees in their official capacity because he was never provided an opportunity to confront and cross-examine those who accused him of sexual harassment. Regarding Ogburia's post-termination due process claims against Jennings, the only defendant sued in his individual capacity, Jennings is entitled to summary judgment as to those claims brought against him in his individual capacity and those brought against him in his official capacity because he did not personally participate in the alleged post-termination due process violations, nor did he have a sufficient causal connection to the alleged violations. Alternatively, since no evidence establishes that Jennings acted in bad faith, with malice, or under a mistaken interpretation of the law with respect to Ogburia's post-

termination due process claims, Jennings is entitled to summary judgment based on state agent immunity as to all such claims.

## II.    FACTUAL AND PROCEDURAL HISTORY[2]

### A.    Overview of Ogburia's Employment at the University

Dr. Sylvanus Ogburia ("Ogburia"), a former professor of business administration at Alabama Agricultural & Mechanical University ("University"), taught human resource management at the graduate and undergraduate level at the University for over twenty-five years. (Doc. 62, Ogburia Dep. at 22:8-14; 31:15-19.) His classes would cover topics such as training and orientation of personnel, as well as government regulations relating to discrimination. (Doc. 62, Ogburia Dep. at 30:1-13.)

The primary events that precipitated Ogburia's termination from his position occurred on November 9, 2005, when two employees, Courtney Davis and Tricia Watson,  who worked for Ogburia, filed separate complaints of sexual harassment against him.  (Def's MSJ AF[3] 1; Doc. 59, Ex. 4.)  Shortly after the complaints were

---

[2]  These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts.'") (citation omitted).

[3]  The designation "AF" stands for admitted fact and indicates a fact offered by the moving party that the non-movant has admitted in written submissions on summary judgment, or by virtue of any other evidence offered in support of the case.  Whenever the non-movant has

filed, Dean Barbara Jones forwarded the complaints to the director of human resources, Lois Thompson, requesting that an Investigative Committee be appointed. (Def's MSJ AF 2; Doc. 59, Ex. 3.)

## B.    The Investigation

Dean Jones also sent Ogburia a letter (Doc. 59, Ex. 4) advising him that "a committee has been charged to investigate [the] allegations." The letter also attached a copy of Watson's and Davis's complaints.  (Def's MSJ, AF 3.)  Each of the complaints provided a detailed set of allegations, explaining each of the separate occasions in which Watson and Davis individually believed that they had been subjected to harassment.  (Doc. 59, Ex. 2.) After the Investigative Committee initially met, it decided that it would address Watson's complaint initially, before turning to Davis's.  (Def's MSJ, AF 11.)

---

adequately disputed a fact offered by the movant, the court has accepted the non-movant's version. In this case, both Plaintiff and Defendants have filed motions for summary judgment. The court's numbering of admitted facts (e.g., AF 1), therefore, corresponds to the numbering of the movant's Statement of Facts as set forth in Docs. 58, 61 and responded to by the nonmovant in Docs. 64, 65.  To distinguish between admitted facts in Plaintiff's motion for summary judgment, and Defendants' motion for summary judgment, the court identifies which party's motion for summary judgment an admitted fact comes from (e.g., Def's MSJ, AF 1; Pl's MSJ, AF 1).

A number following a decimal point corresponds to the particular sentence within the numbered statement of facts.  For example, (Def's MSJ, AF 5.2) would indicate the second sentence of paragraph 5 of Defendants' Statement of Facts is the subject of the court's citation to the record. Similarly, the designation "AAF" stands for additional admitted fact and corresponds to the nonmovant's Statement of Facts contained in Docs. 64, 65 and responded to by the movant in Docs. 67, 68.  Any other facts referenced by the parties that require further clarification are dealt with later in the court's opinion.

Regarding Watson's allegations, the committee met with both Ogburia and Watson individually.  (Def's MSJ, AF 12-13; Doc. 59, Slaughter Dep. at 83:16-20.) Ogburia denied the allegations verbally and he provided a detailed written response, complete with attached exhibits, denying Watson's allegations.  (Def's MSJ, AF 12-13.)  The committee advised Ogburia that its job was to merely pass on a finding of whether or not the complaints were valid.  (Pl's MSJ, AF 13.) While the investigation was pending, Watson authored a letter to the University's EEOC Officer, explaining that since she filed her formal complaint, Ogburia had been subjecting her to a hostile environment at work.  (Def's MSJ, AF 16; Doc. 59, Ex. 9 at 1-2.)   Watson subsequently wrote a letter of resignation, which she sent to Ogburia on December 15, 2005, explaining that she was resigning because of Ogburia's conduct.  (Def's MSJ, AF 17; Doc. 59, Ex. 10 at 1-2.)  Additionally, she provided two witnesses who provided their comments to the committee.  (Doc. 59, Ex. 14 at 1.)  Ogburia denied the allegations in the resignation letter and submitted his response in writing, via letter, to Lois Thompson, who informed Ogburia that she would forward the letter to the Investigative Committee.  (Def's MSJ, AF 18-19.)  Having reviewed all of the above evidence, the committee voted 3-0 in finding that there was "no specific evidence of sexual harassment."  (Doc. 59, Ex. 13 at 1, AAMU 0255.)  Specifically, the committee determined that Watson's witnesses did not corroborate her allegations

and that Ogburia's explanations for his conduct were supported by the evidence.  (*Id.*)

However, the committee did note that some of Ogburia's "comments and/or actions

may have been interpreted as inappropriate or insensitive."  (*Id.* at 2, AAMU 0256.)

Thus, the committee recommended that Ogburia meet with the Office of Human

Resources to "discuss the parameters and dimensions of sexual harassment in the

work place."  (*Id.*)

With respect to Davis's allegations, the same Investigative Committee met with

Ogburia and Davis individually.  (Def's MSJ, AF 23.)  The committee met with Dr.

Ogburia on two occasions.  (Pl's MSJ, AF 9.)  Ogburia provided a detailed written

response to the allegations and he verbally denied the allegations to the committee.

(Def's MSJ, AF 24.)  The committee also interviewed four other witnesses, whose

names were provided to the committee by Ogburia.  (Def's MSJ, AF 26.)  Davis

supplemented her complaint with the letters of other women, Crystal Goodwin and

Dominique Melton,  who had worked for Ogburia and had lodged harassment

complaints against Ogburia in the past.  (Doc. 59, Ex. 20.)  In her letter providing

these previous allegations, Davis asked, "[h]ow many times can the same man be

accused of the same thing before something is done?" (*Id.*)  The committee voted 3-0

in finding that there was "evidence of sexual harassment."  (Doc. 59, Ex. 21.)

Further, the committee recommended that "a letter of reprimand be placed in Dr.

Ogburia's personnel filed and that the University place him on a three year probationary status with the stipulation that any future incident of sexual harassment result in the termination of his employment." (*Id.*)   The committee never considered terminating Ogburia.  (Pl's MSJ AF 11.)

Besides the above-described incidents, Ogburia had been accused of sexual harassment in a separate incident that occurred in 2001.  (Def's MSJ AF 7.)  Ogburia received a letter from Dean Jones at the conclusion of that investigation, recognizing that there was probable cause to believe that sexual harassment occurred and putting Ogburia on probation for a two-year period.  (Doc. 62, Ogburia Dep. at 86:18-87:23.)

## C.    Ogburia's Termination

Dr. Robert Jennings, President of the University as of January 17, 2006, was informed, shortly after taking office, that Ogburia's situation required his immediate attention.  (Def's MSJ AF 29-30.)   As chief executive officer of the University, Jennings had the power to hire and fire employees.   (Pl's MSJ, AF 17.) After receiving the investigation committee's report, Jennings requested to see "the entire file" on Ogburia from the human resources director.  (Pl's MSJ, AF 15-16.)  Jennings never discussed the committee's findings with any member of the investigation committee.  (Pl's MSJ, AF 16.)  When Jennings concluded his review, he wrote a letter to Ogburia, on February 20, 2006, informing him that "[i]n light of the

7

committee's decision, I find just cause to terminate your employment with the university, effective at the end of the Spring 2006 semester, in accordance with section 5.2 of the university faculty handbook." (Doc. 59, Ex. 24.)

At this time, Jennings was unaware that Ogburia was a tenured member of the faculty. (Pl's MSJ, AF 21.) Jennings never had any communications with Ogburia prior to making his decision to terminate Ogburia. (Pl's MSJ, AF 22.) Jennings's decision rested in part on his finding that "at least four females in [Ogburia's] employ have lodged sexual harassment complaints since 2001 and that you previously have been reprimanded regarding this conduct." (Doc. 59, Ex. 24.) Jennings also advised Ogburia that "the administrative appeals process via the dean and vice president of academic affairs is available, should you choose to challenge this action." (*Id.*) Finally, he added that "the grievance procedure is outlined in the faculty handbook section 5.7." (*Id.*)

As explained by the University's faculty handbook, section 5.2, the procedure for terminating tenured faculty is as follows:

> If a tenured faculty member is to be terminated, the Provost and Vice President for Academic Affairs will notify the individual by certified letter by May 1st, that employment will be terminated, state the date of termination and the reason(s) for termination in accordance with the "Statement on Procedural Standards in Faculty Dismissal Proceedings" published in the AAUP Policy Documents and Reports (1990). . . . Termination of an appointment with tenure may be instituted

by the University only for adequate **_just_** cause.  Although it is not intended to be an exhaustive list, adequate **_just_** case must consist of any one or all of the following:

A.   Academic or professional incompetence;
B.   Continued and un-remedied inadequacy in professional performance of properly assigned duties;
C.   Financial exigency of the University;
    1.   Bona fide discontinuance or substantial modification of an academic program or department resulting in significantly diminished personnel requirements.
    2.   Neglect of duty;
    3.   Insubordination;
D.   Conviction of a felony or any offense involving moral turpitude, or a plea of guilty or of _nolo contendere_ with regard to a felony or any such offense;
E.   <u>Sexual harassment or other conduct that falls below minimum standards of professional integrity;</u>
F.   Refusal to comply with reasonable rules, regulations, and policy; and
G.   Other good and adequate just causes.

(Doc. 62, Ex. I (bold in original, underlining emphasis added); Def's MSJ, AAF 59-

60.)  Further, section 5.2  states:

In the event that dismissal of the faculty member is sought, there will normally be a record either of progressive steps of disciplinary action (and related action, if any, within the Faculty Grievance Procedure), or of the appropriate review procedure (e.g., alleged sexual harassment) prior to the bringing of dismissal charges.  Only in an unusually serious or sudden case of gross personal misconduct, (including sexual harassment, unfitness as a teacher or researcher, or gross neglect of duty) may dismissal charges be brought without a prior record of corrective discipline. **Termination of a tenured faculty member must be approved by the president.**

9

(*Id.* (emphasis in original).)

In a separate section of the handbook, Section 5.4, certain "disciplinary procedures" are discussed that are "permissive and discretionary," "none of the listed procedures is a prerequisite to termination or dismissal." (Doc. 62, Ex. I.) Among the disciplinary procedures listed in this section are probation, reprimand, and suspension. (*Id.*) Further, under the heading "Notice," the handbook states that "[e]mployees will be notified in writing, informing them of the grounds or reasons disciplinary action is taken," and that "[e]mployees will be given an opportunity to submit any information which they wish to be considered in reaching a determination concerning whether disciplinary action should be taken, and if so, which disciplinary procedure will be exercised." (*Id.*).

Nothing in the handbook gives an employee any right to meet with the President prior to any termination decision, and nothing in the handbook says that the president must provide notice before a termination decision is made. (Pl's MSJ, AF 32.) Although Jennings referred to Section 5.2 of the handbook in his termination letter, and Section 5.2 maintains that termination of faculty members should be in accordance with the published "Statement on Procedural Standards in Faculty Dismissal Proceedings," Jennings has never seen a copy of those standards. (Pl's MSJ, AF 34.)

### D.     Ogburia's Post-Termination Grievance

Although Jennings's February 20, 2006, letter referred to both an administrative appeals process and a grievance procedure, a letter from Ken Hairston, General Counsel for the University, to Ogburia's attorney later confirmed that the "administrative appeals process" was not available and that "[Ogburia], since he wants to contest the [President's] decision, should proceed with the grievance process as set out in the faculty/administrative staff handbook § 5.7 rather than the normal appeal routine via his dean, and subsequently, the vice president for academic affairs before initiating a grievance."  (Doc. 59, Ex. 29; Def's MSJ, AAF 54.)

Prior to filing his grievance, Ogburia received a termination letter from human resources at the University, effectively ending his employment as of May 15, 2006. (Def's MSJ, AAF 56.)

The grievance procedure referred to by Jennings is available to both tenured and non-tenured faculty, and Jennings, as he explained in his deposition, intended the grievance procedure to do "whatever it normally does at the University for employees who invoke that privilege."  (Pl's MSJ, AF 30.)  On March 21, 2006, Ogburia filed a grievance against Jennings, challenging his decision.  (Def's MSJ, AF 39.)

According to Section 5.7 of the handbook, the grievance procedure is designed to remedy claims that an employees' "rights and entitlements have been adversely

affected due to a violation, misapplication or misinterpretation of policies, regulations, or procedure." (Doc. 62, Ex. 10 to Ex. G, AAMU 00064.)  Under these procedures, "[w]hen a faculty/staff member's grievance concerns termination, demotion or other disciplinary actions, the burden of proof shall rest with the administration; justification for such actions shall be based on appropriate reasons." (*Id.* at AAMU 00066.)  Further, "[t]he recommendation of the Hearing Committee shall be based exclusively on the evidence presented at the hearing, and "[a] majority vote of the Committee shall determine the recommendation." (*Id.*)  Finally, "[w]hen the grievance is against the President, the report of the grievance committee <u>shall</u> be submitted to the Board of Trustees for final disposition." (*Id.* (emphasis added).)

After receiving Ogburia's grievance, the Grievance Committee found that a formal hearing was warranted.  (Def's MSJ, AF 40.)   Members of the Hearing Committee[4] were selected from several different areas of the University in an attempt to ensure that the process was fair.  (Def's MSJ, AF 42.)

Barbara Cady was the chairperson of the Grievance Committee and she was informed that all inquiries for the administration should be directed to Jennings, because he was the person against whom the grievance had been filed.  (Pl's MSJ, AF

---

[4]  Individuals who serve on the Grievance Committee may be selected to participate in a grievance hearing as part of a Hearing Committee. (Doc. 62, Ex. 10 to Ex. G.)

45.)  Cady attempted to contact Jennings several times in order to determine if he had any witnesses that he wished to present, but Jennings never responded.  (Pl's MSJ, AF 46-47.)  Cady also provided Jennings with a list of Ogburia's witnesses, but she never received any communication from Jennings or any other member of the administration regarding the grievance.  (Pl's MSJ, AF 48-49.)  In fact, Jennings did not recall ever hearing about the grievance until after the litigation had been initiated. (Pl's MSJ, AF 50.)

At the June 28, 2006, hearing, no member of the administration attended the hearing and, as a result, the administration failed to put on any witnesses.  (Pl's MSJ, AF 53.)  Ogburia stated his objections to proceedings, including his objection to the fact that Jennings did not appear at the hearing.  (Pl's MSJ, AF 54.)  Cunningham, the chairman of the Hearing Committee, presented the administration's position regarding the grievance.  (Pl's MSJ, AF 55.)  The Hearing Committee did not reach a decision after this first hearing, and it therefore held a second hearing, again at which no member of the administration was present.  (Pl's MSJ, AF 57, 59.)

Members of the Grievance Committee were not reviewing the substantive merits of Jennings's decision to terminate Ogburia; instead, they were addressing a "due process" grievance.  (Pl's MSJ, AF 60.)  Specifically, they were trying to determine if the Investigative Committee followed the faculty handbook and the

procedures in investigating the harassment charges filed against Ogburia.  (Pl's MSJ, AF 60-61.)  According to Cunningham, the chairman of the Hearing Committee, and the committee member who presented the administration's position at the hearing, the hearing was "not about termination" but about whether Ogburia received "due process." (Pl's MSJ, AF 62.)  The committee did not hear testimony from Watson or Davis, because the committee deemed it unnecessary to speak with them, since it was not reviewing whether the allegations were true or false. (Pl's MSJ, AF 63-64.)  However, the committee did hear testimony from additional witnesses, who were called by the committee, and not by Ogburia.  (Def's MSJ, AF 49.)

Following the hearing, the Grievance Committee issued a report on July 26, 2006,  that stated the following recommendation:

> Based on these findings, it appears that Dr. Sylvanus Ogburia's due process rights may have been violated because the same committee was used to investigate two separate cases of sexual harassment which may have biased the final results.  Because of this, it is recommended that the last case be investigated by a neutral committee <u>before any final action is taken by the University</u>.

(Pl's MSJ, AF 66 (emphasis added).)  Ogburia, however, had already been officially terminated  pursuant to a letter from human resources prior to the hearing on his grievance.  (Def's MSJ, AAF 75.)

As previously discussed, "[w]hen the grievance is against the President, the

14

report of the grievance committee <u>shall</u> be submitted to the Board of Trustees for final disposition." (Doc. 62, Ex. 10 to Ex. G, AAMU 00066 (emphasis added).)  Pursuant to Ala. Code. § 16-49-26, "[t]he Board of Trustees of Alabama Agricultural and Mechanical University shall hold three regular meetings at the [U]niversity on the fourth Thursday in February, June, and October, unless the board or Governor[,] as ex officio president, shall determine to hold its meetings at another time."  (Def's MSJ, AF 56.)

The decision to terminate a member of the faculty at the University has always been made by the President.  (Def's MSJ, AAF 51.)  No one from the Board of Trustees has ever reversed Jennings's decision to terminate an employee.  (Def's MSJ, AAF 52.)  In fact, Jennings testified during his deposition that he was not aware of any procedure that could reverse his decision to terminate Ogburia. (Doc. 62, Jennings Dep. at 169:3-8.)  Following his receipt of the Grievance Committee's recommendation, Ogburia's counsel wrote the University's general counsel on August 7, 2006, and stated  that "[i]f Dr. Jennings is going to insist upon termination, then I believe we need to attempt to agree on the procedure for Dr. Ogburia's Due Process hearing.  If the University is going to insist that Dr. Ogburia has already received Due Process or that he is not entitled to a hearing, I need to know that as well." (Doc. 62, Ex. 29 to Ex. G.)  Further, Ogburia's counsel wrote: "Dr. Ogburia

has been waiting since February to receive his Due Process hearing . . . [i]f you and I cannot reach an agreement within the next fourteen (14) days to provide Dr. Ogburia with a Due Process hearing, I believe that I will possess no alternative than to discuss litigation options with my client." (*Id.*).   The record contains no indication that Ogburia or his counsel ever received a response to this inquiry.

### E.    Ogburia's Lawsuit

Ogburia initiated this lawsuit on September 19, 2006, in the Circuit Court of Madison County, Alabama.  (Doc. 1, Ex. 1 at 2.)  Because the complaint alleged federal causes of action, the Defendants removed the case to this Court on October 27, 2006. (Doc. 1.)  The Defendants filed their first motion to dismiss on October 31, 2006 (Doc. 2.), which this Court granted in part and otherwise denied.  (Doc. 14.) However, the Court granted in part Ogburia's motion to reconsider (Docs. 16, 19), and Ogburia thereafter filed an Amended Complaint (Doc. 26).

 Ogburia's Amended Complaint contained six counts.  (*Id.*)  Count One sought declaratory and injunctive relief against all defendants for failure to comply with the University's grievance policy.  (*Id.* at ¶¶ 48-51.)  Count Two alleged a breach of contract by the Trustees and Jennings in their official capacities.  (*Id.* at ¶¶ 52-55.) Count Three sought a petition for writ of mandamus against Jennings and the Trustees in their official capacities.  (*Id.* at ¶¶ 56-58.)  In Count Four, Ogburia alleged

a due process violation under the Alabama Constitution by Jennings in his individual and official capacities and by the Trustees in their official capacities. (*Id.* at ¶¶ 59-65.) Count Five alleged a deprivation of procedural due process under the United States Constitution against Jennings in his individual and official capacities and the Trustees in their official capacities. (*Id.* at 66-73.) Finally, in Count Six, Ogburia brought a claim for wrongful termination against Jennings in both his official capacity and his individual capacity. (*Id.* at ¶¶ 74-79.) Defendants then moved to dismiss Ogburia's Amended Complaint (Doc. 26) and, on January 7, 2008, this Court granted the motion in part and denied it in part. (Doc. 43.) Specifically, this Court dismissed Count Two and Count Six of the Amended Complaint. (*Id.* at 48-49.) It also granted the motion as to Ogburia's state law claims (including claims in Count Four for monetary damages for deprivation of due process under the Alabama Constitution of 1901) against Jennings and the Trustees in their official capacities. (*Id.* at 48.) However, in all other respects, the motion was denied. (*Id.* at 49.)

After the completion of discovery, the parties filed their cross-motions for summary judgment on January 12, 2009. (Docs. 57; 60.) Both Plaintiff and Defendants have provided thorough and lengthy briefs on the issues before the Court (Docs. 58; 61; 64; 65; 67; 68.) The case is now under submission, and the Court now turns to the substantive aspects of the motions.

## III.   STANDARD OF REVIEW

### A.   Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).

The party moving for summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(c) requires the nonmoving party to go beyond the pleadings and, by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* at 324.

The substantive law will identify which facts are material and which are irrelevant. *Chapman*, 229 F.3d at 1023; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *Chapman*, 229 F.3d at 1023; *Fitzpatrick v.*

18

*City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *Chapman*, 229 F.3d at 1023.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991)(*en banc*)).  If the moving party bears the burden of proof at trial, then it can meet its burden on summary judgment only by presenting positive evidence that demonstrates the absence of a genuine issue of material fact; i.e., facts that would entitle it to a directed verdict if not controverted at trial. *Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the nonmoving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the nonmoving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the nonmoving party must respond with positive evidence sufficient to resist a motion for a directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of any evidence in the record in support of a judgment for the nonmoving party on the issue in question. This method requires more than a simple statement that the nonmoving party cannot meet its burden at trial but does not require evidence negating the nonmovant's claim; it simply requires the movant to point out to the court that there is an absence of evidence to support the nonmoving party's case. *Fitzpatrick*, 2 F.3d at 1115-16. If the movant meets its initial burden by using this second method, the nonmoving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the nonmoving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. However, when responding, the nonmovant can no longer rest on mere allegations, but must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law. *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224

F.2d 338, 345 (5th Cir. 1955); *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996). The court will consider each motion independently, and in accordance with the Rule 56 standard.[5] *See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit." See WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327-28 (3d ed. 1998).

## B.   Qualified Immunity

Since Ogburia brings claims based on 42 U.S.C. § 1983 against Jennings in his individual capacity, the Court must also set forth the standard for qualified immunity. "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Cottone v. Jenne*, 326 F.3d 1352, 1357 (11th Cir. 2003) (internal quotation marks and citations omitted). "To receive qualified

---

[5] Rule 56 was recently amended in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis supplied). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version.

21

immunity, a government official first must prove that he was acting within his discretionary authority." *Id.* at 1357-58.

This is a two-part test.  Under the first step, "the defendant must [prove that he or she was] performing a function that, but for the alleged constitutional infirmity, would have fallen within his legitimate job description." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1266 (11th Cir. 2004).  Next, the defendant must prove that he or she was "executing that job-related function." *Id.* at 1267.  "Once a defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that the defendant is not entitled to qualified immunity." *Cottone*, 326 F.3d at 1358.

The Supreme Court has, until recently, required a  two-part inquiry to determine the applicability of qualified immunity, as established by *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  Under the *Saucier*  test,  "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002).   If, under the plaintiff's allegations, the defendants would have violated a constitutional right, "the next, sequential step is to ask whether the right was clearly established." *Cottone*, 326 F.3d at 1358 (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The "clearly established" requirement is designed to assure

that officers have fair notice of the conduct which is proscribed. *Hope v. Pelzer,* 536

U.S. 730, 739 (2002). This second inquiry ensures "that before they are subjected to

suit, officers are on notice their conduct is unlawful." *Saucier v. Katz,* 533 U.S. 194,

206 (2001). The "unlawfulness must be apparent" under preexisting law. *Anderson*

*v. Creighton,* 483 U.S. 635, 640 (1987).

This rigid framework was recently made non-mandatory by the Supreme Court

in *Pearson v. Callahan*, 129 S. Ct. 808 (2009), in which the Court concluded that,

"while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be

regarded as mandatory." Thus, "judges of the district courts and the courts of appeals

should be permitted to exercise their sound discretion in deciding which of the two

prongs of the qualified immunity analysis should be addressed first in light of the

circumstances in the particular case at hand." *Id.*

Despite the Supreme Court's recent modification of *Saucier*'s analytical

process, the substantive analysis remains unchanged; a government official is entitled

to qualified immunity protection as long as he "could have believed" his conduct was

lawful. *Hunter v. Bryan,* 502 U.S. 224, 227 (1991). To deny immunity, Ogburia must

affirmatively demonstrate that "no reasonable competent [official] would have" acted

as Jennings did. *Malley v. Briggs,* 475 U.S. 335, 341 (1986). Despite the Court's

new-found discretion in applying the *Saucier* framework, it nevertheless believes that

23

the traditional two-step approach is appropriate in the instant case.  Thus, the Court first addresses whether a constitutional violation exists, before turning to whether either of the defendants are entitled to qualified immunity.

## IV.   ANALYSIS

### A.   Procedural Due Process Claims Under the United States Constitution

#### 1.   *McKinney v. Pate* does not require dismissal of all of Ogburia's claims.

Defendants first argue that the Eleventh Circuit's decisions in a line of cases following *McKinney v. Pate*, 20 F.3d 1550 (1994) (*en banc*) require the dismissal of all procedural due process claims because Ogburia did not avail himself of adequate available state law remedies.  (Doc. 58 at 13.)  However, as explained below, the Court rejects Defendants' argument because there is undisputed evidence that would permit the inference that the additional state-law remedy–review by the Board of Trustees–was not adequate as a matter of law.

In *McKinney*, the plaintiff, McKinney, was a former employee of Osceola County, Florida, who was terminated from his position as a building official due to poor performance.  *Id.* at 1554-1555.  The County Board of Commissioners held hearings and ultimately upheld the charges listed in the notice of dismissal provided to McKinney.  *Id.* at 1555.  Believing that he was terminated because of an improper

24

political bias, McKinney filed his claim in federal court, alleging a substantive due process violation under Section 1983. *Id.* A jury trial was held on this claim and the plaintiff prevailed, but the district court entered judgment as a matter of law on behalf of the defendants. *Id.*

The Eleventh Circuit initially recognized that the procedural component of the due process clause controlled and not the substantive component. *Id.* at 1561. The Court then turned to McKinney's allegation that his termination hearings were biased and that he therefore did not receive the process he was due. *Id.* at 1562. The Court recognized that "[a] demonstration that the decisionmaker was biased . . . is not tantamount to a demonstration that there has been a denial of procedural due process [, since] procedural due process violations do not become complete unless and until the state refuses to provide due process." *Id.* at 1562 (internal quotations and citations omitted). The court further noted that "in the case of an employment termination case, 'due process' does not require the state to provide an impartial decisionmaker at the pre-termination hearing. The state is obligated only to make available the 'means by which [the employee] can receive redress for the deprivations.'" *Id.*

The court then noted that under *Parratt v. Taylor*, 451 U.S. 527 (1981), and *Hudson v. Palmer*, 468 U.S. 517 (1984), due process does not require pre-deprivation

25

hearings where holding a hearing would be impracticable and that in those situations

due process only requires a means of redress for property deprivations.  *Id.* at 1563.

In light of these cases, the court concluded:

> The precedent established by *Parratt* is unambiguous: even if McKinney suffered a procedural *deprivation* at the hands of a biased Board at his termination hearing, he has not suffered a *violation* of his procedural due process rights unless and until the [state] refuses to make available a means to remedy the deprivation.  As any bias on the part of the Board was not sanctioned by the state and was the product of the intentional acts of the commissioners, under *Parratt*, only the state's refusal to provide a means to correct any error resulting from the bias would engender a procedural due process violation.

*Id.*  (emphasis in original).

The court then noted that McKinney had "failed to take advantage of any state

remedies" and it therefore addressed the issue whether any available state remedies

were adequate.  *Id.*  In making this determination, the court first found that the power

of a Florida court, through a writ of *certiorari*, could remedy the alleged

deprivations–it could order a new hearing.  *Id.*  Next, the court noted that the scope

of the Florida Court's review power encompassed McKinney's Section 1983 claim.

*Id.*  Finally, the court noted that the state law remedy was adequate, since the Florida

courts "possess the power to remedy McKinney's loss both in terms of damages and

equitable relief."  *Id.* at 1564.  Thus, the court concluded that "McKinney's state

remedy was capable of providing McKinney with all the relief warranted.  Even if

McKinney's bias allegations are true, the presence of a satisfactory state remedy mandates that we find no procedural due process violation occurred."  *Id.*

Later decisions clarify that *McKinney* does not impose an exhaustion requirement upon Section 1983 plaintiffs.  For instance, in *Cotton v. Jackson*, 216 F.3d 1328 (11th Cir. 2000) (*per curiam*), another case relied upon heavily by the Defendants, the Eleventh Circuit specified that the directive in *McKinney* "is not an exhaustion requirement.  Instead, this directive is a recognition that procedural due process violations do not even exist <u>unless no adequate state remedies are available</u>." *Id.* at 1331 n.2 (emphasis added).  The *McKinney* court did not conclude its analysis when it found that other state law remedies existed; it only reached its decision after a finding that those available remedies were <u>adequate</u>.

The decision in *Cotton* provides a particularly apt comparison in the instant case, because *Cotton* also involved the termination of a university faculty member for alleged sexual harassment. *Id.* at 1329-1330.  Soon after his termination, Cotton filed suit against the university and its president.  *Id.*  The court followed the rubric set forth in *McKinney*, noting that "[i]f adequate state remedies were available but the plaintiff failed to take advantage of them, the plaintiff cannot rely on that failure to claim that the state deprived him of procedural due process." *Id.* at 1332.  Ultimately, the court concluded that because "the writ of mandamus would be available under

state law to [Cotton], and because we believe that mandamus would be an adequate remedy to ensure that [Cotton] was not deprived of his due process rights, we conclude that [Cotton] has failed to show that inadequate state remedies were available to him to remedy any alleged procedural deprivations." *Id.* at 1333 (internal citations omitted).  Thus, as in *McKinney*, the court in *Cotton* also looked to the adequacy of the available remedy before concluding that there was no due process violation.

The Eleventh Circuit further clarified *McKinney* in *Horton v. Bd. of County Com'rs of Flagler County*, 202 F.3d 1297 (11th Cir. 2000). Therein, the court explained:

> [O]ur McKinney opinion, and more importantly, its reasoning and holding establish that exhaustion and ripeness are not the doctrines in play, and that the completeness of the procedural due process violation is decided by looking at existing state remedial law.  If the rule of *McKinney* were otherwise, we would have had to hold that McKinney's claim should have been dismissed as unripe. We would have had to do that because McKinney himself had never presented his federal due process claim in state court.  But we did not tell McKinney his federal claim was unripe and dismiss it without prejudice to his pursuing that claim in state court. Instead, we told him that he lost. We told McKinney that he did not have a viable federal due process claim, and we told him the reason he did not is that Florida law provided an adequate remedy for the type of procedural deprivation McKinney claimed to have suffered, even though he had not taken advantage of that state remedy.

*Id.* at 1301.  Thus, the Court in *Horton* clarified that *McKinney* does not require

exhaustion of state remedies, but if <u>adequate</u> state remedies exist, then there is no due process violation. *Accord.*, *Foxy Lady, Inc. v. City of Atlanta, Georgia*, 347 F.3d 1232, 1239 (11th Cir. 2003) ("Accordingly, we conclude that sufficient state process exists to correct any alleged deficiency in the City's liquor license revocation process afforded under § 30-27. Because an <u>adequate</u> post-deprivation process is in place under state law, no federal procedural due process claim exists.") (emphasis added); *Johnson v. Atlanta Independent School System*, 137 Fed. Appx. 311, 315 (11th Cir. 2005) ("Where the state has <u>adequate</u> remedies to cure due process deprivations, that a plaintiff has not taken advantage of, a plaintiff may not pursue his claim in federal court . . . . Upon review of the record and upon consideration of the parties' briefs, we find no reversible error. [Plaintiff] was offered a hearing and declined attendance before his termination. Thus, the district court properly granted summary judgment on this claim.") (emphasis added); *see also Maples v. Martin*, 858 F.2d 1546, 1551-1552 (11th Cir. 1988) (noting in a pre-*McKinney* case involving Auburn University faculty members who were transferred that because they "failed to avail themselves of [the grievance] procedure and presented <u>no evidence that resort to it would have been futile</u> . . . [the employees] have not demonstrated that they were deprived of a constitutionally protected property interest.") (emphasis added); *Lewis v. Hillsborough Transit Auth.*, 726 F.2d 664, 667 (11th Cir. 1983) (*per curiam*) (finding

in a pre-*McKinney* case no procedural due process violation when the plaintiff admitted that a "grievance procedure, if utilized, could eliminate a constitutional violation," thereby implicating that the available state law remedy was adequate).

In light of the above-described cases, the Defendants' argument must fail. According to their argument, because the Grievance Committee notified Ogburia that it had ruled in his favor and "recommended that the last case be investigated by a neutral committee ***before any final action is taken by the University***" his claim must fail. (Doc. 58 at 19 (emphasis in original).)  Rather than waiting for final action from the Board, Ogburia filed his lawsuit nearly fifty-five days after the favorable decision from the Grievance Committee.  Pursuant to Ala. Code § 16-49-26, the next meeting of the Board (unless a special session was called) would have been in October. (Def's MSJ, AF 56.)  Defendants' analysis would end here, as they only pay lip-service to the idea of adequacy (as discussed *infra* at 30), but the Court must determine, under *McKinney*, whether the available remedies could have addressed Ogburia's complaints; i.e., they would have provided him with the process he was due.

It is clear that an administrative remedy existed and that Ogburia did not complete that remedy but, in order to apply *McKinney*, the Court must also determine that the available state law remedy was adequate.  20 F.3d at 1563-1564.  Defendants

do not raise any substantive analysis of how review by the Board of Trustees would have provided an adequate remedy to Ogburia; instead, their only argument as to adequacy involves a cursory statement in Ogburia's Amended Complaint. Specifically, Defendants argue that Ogburia has judicially admitted (thereby conclusively establishing for the purposes of this case) that appeal to the Board could have remedied his complaint and provided all of the process that he was entitled to:

> A & M is governed by its trustees, each of whom are sued in their official capacities. . . . The Trustees are responsible for adopting and enforcing the policies of A & M. The Trustees are further responsible for ensuring that all employees of A & M receive the benefit of A & M's policies and for ensuring that the employees are not deprived of their constitutional and statutory rights. The Trustees have the authority to order the relief requested by the plaintiff.

(Doc. 58 at 23 (citing Am. Compl.; Doc. 26 at ¶ 4).)   As a general rule, a party is "bound by the admissions in his pleadings." *Best Canvas Products & Supplies, Inc. v. Ploof Truck Lines, Inc.*, 713 F.2d 618 (11th Cir. 1983) (finding that a statement in a complaint averring that the cause of action arose in Georgia constituted a judicial admission, conclusive for purposes of the lawsuit); *Cabriolet Porsche Audi, Inc. v. American Honda Motor Co., Inc.*, 773 F.2d 1193, 1202 n.3 (11th Cir.1985) (noting that "Cabriolet is bound by admissions in its pleadings" when an amended pleading stated that the defendant operated an allocations system that delivered motor cars to its dealers).   However, the Eleventh Circuit has further explained that "legal

31

arguments are distinguishable from judicial admissions." *Alabama-Tombigbee Rivers Coalition v. Norton*, 338 F.3d 1244, 1254 (11th Cir. 2003) (citing *Z.J. Gifts D-4, LLC v. City of Littleton*, 311 F.3d 1220 , 1233 (10th Cir. 2002)); *see also* Am. Jur. Evidence § 783 (2008) ("A judicial admission is a deliberate, clear, unequivocal statement of a party about a concrete fact within that party's knowledge, not a matter of law."). Ogburia's concession that the Board had the power to remedy his grievance and order a new investigation is an admission of fact, but the conclusion that the state law remedy was <u>adequate</u> is a legal question that Ogburia cannot "admit" for purposes of the litigation.

Moreover, Ogburia's "admission" is contained in his introduction to the case, where he describes the parties to the litigation; later in his Amended Complaint, Ogburia clarifies that the Trustees "failed to provide [Ogburia] with post-termination procedural due process." (Doc. 26 at ¶ 69.) Thus, even to the extent that Ogburia's prior statement may have "admitted" that the Board of Trustees could provide adequate due process, that "admission" is later contradicted by Ogburia's allegation that they did not provide this process through their post-termination hearing. No facts in the record suggest that review by the Board would have been adequate, and it is not the Court's duty to assume the adequacy of review by the Board of Trustees. Consequently, Defendants' *McKinney*-based argument must be rejected.

32

2.   <u>Ogburia received adequate pre-termination due process</u>.

As explained in this Court's Memorandum Opinion and Order on the Defendants' Motion To Dismiss Ogburia's Amended Complaint (Doc. 43 at 27), *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) is the seminal authority on pre-deprivation due process claims.  In *Loudermill*, the Supreme Court explained the minimal requirements for due process in the context of public employment:

> The essential requirements of due process . . . are notice and an opportunity to respond.  The opportunity to present reasons, either in person or in writing, why proposed action should not be taken is a fundamental due process requirement . . . . The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story.

470 U.S. at 546.  In *Stewart v. Bailey*, 556 F.2d 281 (5th Cir. 1977)[6], also previously recognized by the parties and this Court as controlling law on this issue, the former Fifth Circuit explained that there were four requirements necessary to afford minimal due process to a teacher:

> (a) He [must] be advised of the cause or causes for his termination in sufficient detail to fairly enable him to show any error that may exist;
> (b) He [must] be advised of the names and the nature of the testimony of witnesses against him;
> (c) At a reasonable time after such advice, he must be accorded a

---

[6]  *See, Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (holding that decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981, are binding in the Eleventh Circuit).

meaningful opportunity to be heard in his own defense; and

(d) That hearing should be before a tribunal that both possesses some academic expertise and has an apparent impartiality toward the charges.

*Id.* at 285.  Minimal due process requirements include "written notice of the reasons for termination and an effective opportunity to rebut those reasons prior to termination."  *Nicholson v. Gant*, 816 F.2d 591, 598 (11th Cir. 1987).  "Effective rebuttal means giving the employee the right to respond in writing to the charges made and to respond orally before the official charged with the responsibility of making the termination decision."  *Glenn v. Newman*, 614 F.2d 467, 471-72 (5th Cir.1980).

It is undisputed that Ogburia was advised of the charges against him.  (Doc. 59, Ex. 4.)  He received a letter from Human Resources detailing the charges against him. He received a copy of the formal complaints lodged against him. (Def's MSJ, AF 3.) Thus, the Court finds that Ogburia was provided sufficient notice.  Ogburia argues that he was not on notice that he could be terminated; however, none of the cases cited state that notice of the possible <u>punishment</u> is required, only notice of the <u>charges</u>.  In any event,  the employee personnel handbook put Ogburia on sufficient notice that he could be terminated for sexual harassment, even as a tenured employee. Specifically, Section 5.2 provided:

Termination of an appointment with tenure may be instituted by

34

the University only for adequate *just* cause.  Although it is not intended to be an exhaustive list, adequate *just* cause must consist of any one or all of the following . . . .

> E.   Sexual harassment or other conduct that falls below the minimum standards of professional integrity.

(Doc. 62, Ex. 9 to Ex. G, AAMU 00059 (emphasis in original).)  Section 3.4.3 of the handbook specifically addresses "Disciplinary Action" for sexual harassment. (*Id.* at AAMU 00023.) It states that:

> If a complaint is found to be valid, the appropriate disciplinary action, consistent with the degree of seriousness of the harassment will be instituted.  Discipline or dismissal of faculty or staff may follow that "Progressive Discipline" policy . . . and may result in . . . [t]ermination of [the] employment of [the] harasser.

*Id.* Besides the fact that the handbook is unmistakably clear that termination is an option in sexual harassment cases, this was not the first time that such a complaint had been filed against Ogburia and, given his past history, he should have been intimately familiar with the possible ramifications of any perceived transgressions. Thus, Ogburia's argument that he was not adequately notified of the charges against him must fail.

Ogburia next argues that his pre-termination due process rights were violated because he was not given an opportunity to meet with Jennings prior to his termination.  (Doc. 61 at 16.)  In support of this argument, he relies on the following

statement from *Nicholson v. Gant*, 816 F.2d 591 (11th Cir. 1987): "Effective rebuttal [against charges levied against an employee] means giving the employee the right to respond in writing to the charges made and to respond orally before the official charged with the responsibility of making the termination decision." *Id.* at 598 (quoting *Glenn v. Newman*, 614 F.2d 467, 471-72 (5th Cir.1980)).  Defendants argue that this language is dicta and that Ogburia received all of the process that he was due when he was allowed to meet with the investigative committee and was afforded the opportunity to respond both orally and in writing to the charges levied against him. (Doc. 65 at 20-23.)

In *Nicholson*, the plaintiff was terminated from her position as an employee of the County Commission of Jackson County, Alabama, after she opposed the election of a new chairman.  *Id.* at 593.  The newly elected chairman terminated her, via personally delivered letter, on his first day in office.  *Id.* The plaintiff requested a hearing before the commission prior to her discharge.  *Id.* at 594.  The commission held a hearing and recommended that the plaintiff not be terminated.  *Id.* Subsequently, the Alabama Attorney General issued an opinion indicating that the Chairman of the County Commission had sole authority to hire and fire clerical employees such as the plaintiff; thus, although the commission opposed his decision, the chairman elected to terminate plaintiff anyway.  *Id.* The plaintiff appealed to the

full county commission (functioning as a personnel review board) but the defendant

adjourned the meeting before it could reach a decision. *Id.* at 595.

The district court entered a directed verdict on behalf of the plaintiff, and the

defendant appealed. On appeal the Eleventh Circuit affirmed, noting:

> In *Thurston v. Dekle*, 531 F.2d 1264, 1273 (5th Cir.1976), *rev'd on other grounds*, 438 U.S. 901, 98 S.Ct. 3118, 57 L.Ed.2d 1144 (1978), this court outlined a procedure to satisfy minimum due process requirements. This includes written notice of the reasons for termination and an effective opportunity to rebut those reasons prior to termination. *Thurston*, 531 F.2d at 1273. "Effective rebuttal means giving the employee the right to respond in writing to the charges made and to respond orally before the official charged with the responsibility of making the termination decision." *Glenn*, 614 F.2d at 472 [(citing *Thurston*, 614 F.2d at 471)]. The Supreme Court has stated that providing "some opportunity for the employee to present his side of the case is recurringly of obvious value" in a pretermination hearing for a public employee. *Loudermill*, 470 U.S. at 543, 105 S.Ct. at 1494. "It is the opportunity to be heard which is protected by the fourteenth amendment." *Washington v. Kirksey*, 811 F.2d 561, 564 (11th Cir.1987). With this in mind, it is clear that the meeting between Nicholson and the Commission on May 18, 1981, did not satisfy the requirements of due process. "At no time did [Nicholson] have the opportunity to present to the [Commission her] version of what happened." *Id.* "The fundamental requisite of due process of law is the opportunity to be heard." *Goldberg v. Kelly*, 397 U.S. 254, 267, 90 S.Ct. 1011, 1020, 25 L.Ed.2d 287 (1970) (quoting *Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914)). Under these circumstances, we feel "[d]ue process requires a more formalistic confrontation of facts and positions." *Ferguson v. Thomas*, 430 F.2d 852, 857 (5th Cir.1970).

816 F.2d at 598. In *Glenn*, the case quoted by the court in *Nicholson* for the

proposition that an opportunity to respond orally to the official making the decision

37

was required, the panel relied on the Fifth Circuit's opinion in *Thurston v. Dekle*, 531 F.2d 1264(5th Cir. 1976), *rev'd on other grounds*, 438 U.S. 901(1978).  In *Thurston* the plaintiff was suspended via letter and at the same time notified that, at the end of his suspension, he would be terminated.  *Id.* at 1266.  The plaintiff was, however, given an opportunity to appeal–which involved a full public hearing.  Faced with these facts, the Fifth Circuit wrote that:

> Since this order commands city action we must define the minimum pretermination procedural elements required by the due process clause of the Fourteenth Amendment. *Arnett* [*v. Kennedy*, 416 U.S. 134 (1974)] and *Davis* [*v. Vandiver*, 494 F.2d 830 (5th Cir. 1975)] guide us to focus on procedures which will minimize the risk of improper termination associated with any dismissal process. Where a governmental employer chooses to postpone the opportunity of a nonprobationary employee to secure a full-evidentiary hearing until after dismissal, risk reducing procedures must be accorded. These must include, prior to termination, written notice of the reasons for termination and an effective opportunity to rebut those reasons. Effective rebuttal must give the employee the right to respond in writing to the charges made and to respond orally before the official charged with the responsibility of making the termination decision.

*Id.* at 1272-1273.

The above-discussed cases all occurred in circumstances where no hearing or investigative process was conducted, and the employees were provided with no opportunity to rebut the charges.  Given these facts, neither *Thurston* nor *Nicholson* stands for the proposition that Ogburia was required to receive an oral hearing before

38

Jennings (in addition to or in lieu of an oral hearing before the Investigative Committee) before he was terminated. Both cases are the product of distinguishable factual circumstances and, as the Defendants correctly argue, "what process is due" depends on the "practicalities and peculiarities of the case." (Doc. 65 at 22 (quoting *Mullan v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 314 (1950)).)

Defendants also present a compelling argument, based on *Loudermill*, that in determining the minimal process due in the pre-termination context, the Court should look to the "balance of the competing interests" at stake, namely, "the private interest in retaining employment, the governmental interest in the expeditious removal of unsatisfactory employees and the avoidance of administrative burdens, and the risk of erroneous termination." *Loudermill*, 470 U.S. at 542-543. As the Defendants argue, imposing a requirement that each tenured employee be afforded a personal meeting with the President (after having met with the Investigative Committee, whose mission is to make fact-finding determinations and a recommendation (Pl's MSJ, AF 13)), would impose an enormous administrative burden on the chief officer of a university that has more than 1,300 employees. (*See* Doc. 65 at 22.) Balancing the competing interests at stake, the Court finds that Ogburia's due process rights were not violated by the Defendants when they failed to provide him with a personal meeting with Jennings prior to his termination.

Finally, Ogburia argues that because he was never notified that Jennings considered 2001 allegations of sexual harassment by Dominique Melton, he did not have notice of all the charges levied against him. (Doc. 61 at 17.)  In response to this argument, Defendants argues that "[d]ue process does not require that Plaintiff be allowed to reargue the merits of previously heard sexual harassment allegations each time a new one is investigated." (Doc. 65 at 24.)  Ogburia does not contend that the process provided to him in 2001 with respect to these previous allegations of sexual harassment was inadequate in any way; instead, he claims that he should have been given an additional opportunity to rebut those charges.  The Court has not discovered any Eleventh Circuit cases addressing this issue.  However, one case cited by the Defendants, *Greer v. Amesqua*, 212 F.3d 358 (7th Cir. 2000), considered the same argument raised by Ogburia and rejected it when it found that the employee "had ample previous opportunity to rebut the factual findings underlying the past charges against him when those disciplinary actions were prosecuted."  212 F.3d at 368.  Based on this finding, the Seventh Circuit concluded that "due process does not require that the [defendant] permit [the plaintiff] to re-argue the merits of his previous offenses each subsequent time that he is charged with violating Department rules." *Id.*

Ogburia presents no authority in support of his own argument, other than a

40

vague appeal to *Loudermill*, arguing that "Dr. Jennings did not comply with the minimum requirement of due process" because he did not re-investigate the 2001 allegations and allow Ogburia to respond.  (Doc. 61 at 20.)  Nothing in *Loudermill* demands this result, as *Loudermill* only requires that an employee be provided an "opportunity to present his side of the story." 470 U.S. at 546.  *Loudermill* does not specify <u>when</u> that opportunity must occur, nor does it hold that a state employer must provide an employee with an opportunity to rebut all previous charges against him, even if the process provided during the first consideration of those charges was adequate.

Further, Ogburia is mistaken in arguing that he did not receive notice that the 2001 allegations were included as part of the most recent charges.  Courtney Davis's November 9, 2005, complaint, written to Dean Jones, injected the previous allegations into her complaint.   (Doc. 59, Ex. 2 at AAMU 273 ("It is my understanding that there were four other women that Dr. Ogburia has sexually exploited (Dominica Anderson, Deralda Bay, Crystal Goodman, and Dominique Melton).  It appears from these names . . . that this is a problem that has been swept under the rug for years . . . .").)  Her reliance on previous allegations was a central part of her complaint against Ogburia and part of her argument that Ogburia's conduct posed a serious problems to students and other staff members. (*See* Doc. 59,

41

Ex. 20, AAMU 0296.)  Thus, Davis's complaint, which was provided to Ogburia as part of the investigative process, put him on notice that the 2001 complaints might be considered as a part of any recommendation by the Investigative Committee or as a part of any decision made by Jennings.

In light of the above findings, Defendants' motion for summary judgment is due to be granted as to Ogburia's pre-termination due process claims brought under Section 1983.  Of course, this also means that Ogburia's motion for partial summary judgment on these claims is due to be denied.  Having determined that Ogburia cannot prevail on his pre-termination due process claims, the Court now turns to the post-termination claims.

> 3.    <u>Ogburia did not receive adequate post-termination due process.</u>

With respect to his post-termination due process claim, the Court wrote extensively on this matter in its Memorandum Opinion and Order on the Defendants' Motion To Dismiss.  (Doc. 43.)

> Plaintiff has alleged the following in support of his post-termination due process claim.   The appeals process called for a grievance committee hearing.  That hearing was held on June 29, 2006, and Plaintiff and his attorney attended.  (*Id*., par. 24, 33).  In violation of the University's grievance policy, Plaintiff was not provided, prior to the hearing, with a list of witnesses against him or with any documents that would be used to support termination of his employment.  (*Id*., par. 25).  In violation of the University's grievance policy, no representative of the administration was present to present contentions in support of

Plaintiff's termination. (*Id.*, par. 26, 27). Instead, the chairman of the grievance committee "present[ed] contentions on behalf of the administration," verbally referencing documents which had never been provided to Plaintiff and which were not provided to Plaintiff during the hearing. (*Id.*, par. 28). **During the hearing, Plaintiff was denied the opportunity to cross examine any witnesses, because no witnesses were presented by the administration**. (*Id.*, par. 30). A second hearing was held on July 21, 2006, which Plaintiff and his attorney attended. (*Id.*, par. 32, 33). The hearing was called by the grievance committee in order for witnesses for the administration to appear and be questioned. (*Id.*, par. 31). Plaintiff's attorney "was not allowed to question witnesses or participate in any manner" at either of the hearings. (*Id.*, par. 33). At the second hearing, "the Committee listened to witnesses who described the process of the investigation of sexual harassment charges against [Plaintiff]. The employees who complained of sexual harassment were never called ... and [Plaintiff] never received an opportunity to cross-examine his accusers." (*Id.*, par. 34). The grievance committee did not rule on whether Plaintiff should be terminated. (*Id.*, par. 36). Instead, they recommended "[B]ased on these findings it appears that [Plaintiff's] due process rights may have been violated because the same committee was used to investigate two separate cases of sexual harassment which may have biased the final results. Because of this, it is recommended that the last case be investigated by a neutral committee before any final action is taken by the University." (*Id.*, par. 36). Plaintiff "was terminated pursuant to procedures regarding sexual harassment, and not the procedures regarding tenured faculty members." (*Id.*, par. 39). The policies regarding sexual harassment "fail to provide notice or a hearing to a tenured employee accused of sexual harassment." (*Id.*, par. 40).

**These allegations are sufficient to state a claim of post-termination due process violation. At no time was Plaintiff allowed to confront, much less cross-examine, his accusers**. *Kelley v. Smith*, 764 F.2d 1412 (11th Cir. 1985), *Adams v. Sewell*, 946 F.2d 757 (11th Cir. 1991) (both *Kelley* and *Adams* reversed <u>on other grounds</u> in *McKinney v. Pate*, 20 F.3d 1550 (11th Cir. 1994)). Defendants say that "[t]he precedential value of both these cases is questionable at best in light of the fact that both have been reversed by *McKinney v. Pate* ...."

(Defendant's reply brief, doc. 33, at 12, n.4).   However, nothing in *McKinney v. Pate* abrogates the proposition for which they are cited by Plaintiff.   *McKinney v. Pate* overruled all prior decisions, including *Kelley* and *Adams*, to the extent that they "granted pretextually terminated employees section 1983 causes of action premised on substantive due process violations." (*McKinney v. Pate*, 20 F.3d 1550, 1560).   Thus, *Kelley* and *Adams* are still good law in this circuit for the proposition that an employee must receive, as a matter of <u>procedural</u> due process during a post-termination hearing, the opportunity to confront and cross-examine his accusers.   *Chambers v. Thompson*, 150 F.3d 1324, 1326 (11th Cir. 1998) ("We are bound to follow a prior panel or en banc holding, except where that holding has been overruled or undermined to the point of abrogation by a subsequent en banc or Supreme Court decision.").   Therefore, to the extent that Defendants' Motion to Dismiss is based on their contention that Plaintiff has failed to state a claim of deprivation of post-termination due process, the Motion is due to be **DENIED**.

(Doc. 43 at 29-31 (underlining in original, boldface text added).)

The undisputed facts in this case establish that Ogburia was not permitted the opportunity to confront his accusers.   No member of the administration appeared at his post-termination hearing, and none of Ogburia's accusers made an appearance at his post-termination hearing.   (Pl's MSJ, AF 53, 57, 59.)

Defendants attempt to lessen the impact of *Adams* and *Kelly* by arguing that "[n]either *Adams* nor *Kelly* hold that not cross-examining one's accuser, standing on its own, amounts to a due process violation." (Doc. 65 at 27.)   However, the fact that the Plaintiff was not provided an opportunity to cross-examine or confront his accusers factored heavily into both decisions.

44

In *Kelly*, the plaintiff was employed in a city utility department and was discharged for refusing to "work standby."  764 F.2d at 1413.  Following his discharge, the plaintiff met with the city manager, who orally told the plaintiff that he would uphold his discharge.  *Id.*  The Eleventh Circuit reversed the district court's entry of summary judgment against the plaintiff with respect to the plaintiff's post-termination claims.  It reached this conclusion based "on the facts of this case."  *Id.* at 1416.  The plaintiff was not permitted to present any witnesses on his behalf, and the city manager never investigated matters that he said he would delve into at a later time.  *Id.*  Critically, the court also noted that "[the plaintiff's] meeting with the city manager was <u>severely lacking</u> in one respect: [the plaintiff's] chief accuser, Smith, was not present at the meeting. Thus, [the plaintiff] had no opportunity to confront and cross-examine his accuser in the presence of the decision maker." *Id.* at 1415 (emphasis added).

Similarly, in *Adams*, the court reemphasized the importance of the ability to cross-examine one's accusers at a post-termination hearing, writing that "[t]his court has emphasized the importance of cross-examination in due process analysis; post-termination proceedings have been held inadequate because a terminated employee 'had no opportunity to confront and cross-examine his accuser in the presence of the decision maker.'" 946 F.2d at 765 (quoting *Kelly*, 764 F.2d at 1415).

After citing to *Kelly*, the court noted that the plaintiff had been denied the opportunity to call witnesses in support of his case, specifically, the employee who had accused the plaintiff of sexual harassment. *Id.* Looking to this fact, along with evidence that the decision maker was biased, the court found that reasonable jurors could find that the post-termination procedures were inadequate. *Id.*

Defendants have not adequately distinguished either of the above-described cases. They cite only one Eleventh Circuit case, *Nash v. Auburn University*, 812 F.2d 655 (11th Cir. 1987), where the court addressed a due process challenge in the context of a student's dismissal. *Nash* is of limited value in the instant case, because it occurred in the context of student dismissal, and not of a faculty member. The court wrote that "we have not expanded the [*Goldberg v. Kelly*, 397 U.S. 254 (1970)] procedural requirements for quasi-judicial termination of welfare benefits in student disciplinary hearings. Where basic fairness is preserved, we have not required the cross-examination of witnesses and a full adversary proceeding." *Id.* at 663-664. However, the Court went on to recognized that the students who were dismissed had an opportunity to <u>confront</u> their accusers, who were present at their hearing, through directing questions to the presiding official. *Id.* at 664. They also heard all of the testimony offered against them. *Id.* Based on these facts, the court found that there was no denial of due process when the students were not allowed to cross-examine

46

adverse witnesses. *Id.*

*Nash*, therefore, does not conflict with the holdings in either *Adams* or *Kelly*; instead (to the extent that *Nash* can be imported to dismissals of tenured professors), it stands for the proposition that indirect confrontation of one's accusers is permissible if direct cross-examination is not allowed.  The plaintiffs in *Nash*, at the very least, were permitted to indirectly confront their accusers.  Critically, none of Ogburia's accusers were present at his post-termination hearing and neither was Jennings, the person against whom the grievance was filed.   *Kelly* and *Adams* remain good law and, under this Court's prior ruling, none of the facts proved during discovery differ from the allegations in the complaint.

> 4.   <u>Jennings is not liable as a supervisor under Section 1983 with respect to Ogburia's post-termination due process claim</u>.

In the section of his brief devoted to qualified immunity[7], Jennings argues that he is entitled to qualified immunity because he did not personally participate in the post-termination process and he was not causally connected to the alleged violations.

---

[7]  The Defendants' brief addresses whether Jennings is entitled to qualified immunity without discussing whether the law is "clearly established" or not.  Instead, they focus on what would more appropriately be titled "supervisory liability."  Thus, their qualified immunity argument, as discussed *infra,* is in actuality an argument that Jennings cannot be liable for any post-termination due process claims because he did not personally participate in those procedures, and because he had no causal connection to the deprivations that occurred during those procedures. (*See* Doc. 58 at 33-37.)

(Doc. 58 at 33-37.)  Because qualified immunity is a separate inquiry, the Court will first address whether Jennings may be liable as a supervisor of the post-termination procedures.

"Supervisory officials are not liable under Section 1983 on the basis of respondeat superior or vicarious liability." *Hardin v. Hayes*, 957 F.2d 845, 849 (11th Cir.1992).  To recover individually from a government official in a supervisory administrative capacity, the plaintiff must show that the supervisor is liable either through personal participation in the acts comprising the alleged constitutional violation, or through the existence of a causal connection between the supervisor's actions and the violation. *Hill v. DeKalb Regional Youth Detention Ctr.*, 40 F.3d 1176, 1192 (11th Cir.1994) (*overruled in part by Hope v. Pelzer*, 536 U.S. 730, 739 n. 9(2002)).

In *Hill*, the Eleventh Circuit addressed the issue of supervisory liability in a case involving the sexual assault of inmates at a juvenile detention center.  As part of his claim, the plaintiff sought recovery against supervisory officials who were in charge of running the detention center.  The court held that these officials could be held individually liable only by demonstrating their "personal participation" in the acts comprising the constitutional violation or "the existence of a causal connection linking their actions with the violation." *Id.* at 1192.  Because the officials "neither

48

assisted nor acquiesced in the alleged sexual assault," nor did they "personally instigate[] a policy that violated [the plaintiff's] constitutional rights" neither of the two considerations in imposing supervisory liability applied. *Id.* at 1192-1195.

Relevant to the causal connection inquiry, as the *Hill* court recognized, is whether or not the supervisor had "final policymaking authority." 40 F.3d at 1194 (citing *Jett v. Dallas Indep. School Dist.*, 491 U.S. 701 (1989)). "Whether a particular official has final policymaking authority is a question of state law." *Brown v. City of Fort Lauderdale*, 923 F.2d 1474 1479 (11th Cir. 1991).

There are no facts indicating that Jennings personally participated in the deficient post-termination grievance procedure to Ogburia. In his opposition to the Defendants' motion for summary judgment, Ogburia enumerates a list of thirteen reasons why he believes that Jennings personally participated in the denial of his due process rights.  (Doc. 64 at 51-52.)  Only two reasons pertain to Ogburia's post-termination claims.  Specifically, Ogburia claims that the grievance process "provided by Jennings did not satisfy the requirements of post-termination due process." (Doc. 64 at 52.)  Additionally, he argues that "Jennings failed to respond to requests for participation in the process by the chair of the grievance committee." (*Id.*)  Both of these reasons depend on whether Jennings had policy-making authority as to Ogburia's grievance process.  As explained in *Brown*, this is a question of Alabama

49

law.  923 F.2d at 1479.

Under Ala. Code § 16-49-2, the Board of Trustees possesses the authority to

make and maintain policies regarding the tenure of faculty:

> The personnel policies and procedures and statement of academic freedom and tenure for the faculty, other officers and professional and operating staff of the university, and the statement of rights and responsibilities of students of the university in force on September 5, 1975, shall be read, construed and have effect as if they were prescribed by the board of trustees created in this chapter; provided, that the board shall prescribe such amendments as it deems necessary and proper and that no person shall be deprived of any right or benefit earned prior to September 5, 1975.

No case cited by either party purports to interpret this statute.  In its own research, the

Court has found no cases that suggest that any entity other than the Board of Trustees

possesses policymaking authority at the University.  Thus, in the absence of contrary

legal authority, the Court finds that Alabama statutory law clearly gives the trustees

alone the power to make and enforce policies regarding the grievance process.  This

conclusion is buttressed by the fact that the faculty handbook specifically gives the

board of trustees authority to oversee (and ultimately issue a ruling upon) any

grievances filed against the president of the University.  (Doc. 62, Ex. 10 to Ex. G,

AAMU 00066.)  Therefore, Jennings cannot be held liable as a supervisor because

he neither personally participated in the post-termination grievance process nor did

he possess authority to exercise policymaking authority under Alabama law or the

University grievance procedures.

In light of this finding, Jennings is entitled to summary judgment on the post-termination due process claims brought against him in both his individual capacity and his official capacity.  There is no factual basis to hold him liable as a supervisor of the post-termination process that Ogburia received.

**B.      Jennings is entitled to state-agent immunity**.

The Alabama Supreme Court has defined state-agent immunity as follows:

A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent's
>      (1) formulating plans, policies, or designs; or
>      (2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
>>            (a) making administrative adjudications;
>>            (b) allocating resources;
>>            (c) negotiating contracts;
>>            (d) hiring, firing, transferring, assigning, or supervising personnel;  or
> (3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
> (4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers' arresting or attempting to arrest persons; or
> (5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.

Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity

> (1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
>
> (2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.

*Ex parte Cranman*, 792 So.2d 392, 405 (Ala. 2000).  After *Cranman*, the court

identified the following legal framework for addressing state-agent immunity issues:

> This Court has established a "burden-shifting" process when a party raises the defense of State-agent immunity. *Giambrone v. Douglas*, 874 So.2d 1046, 1052 (Ala.2003). In order to claim State-agent immunity, a State agent bears the burden of demonstrating that the plaintiff's claims arise from a function that would entitle the State agent to immunity. *Giambrone*, 874 So.2d at 1052; *Ex parte Wood*, 852 So.2d 705, 709 (Ala.2002). If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority. *Giambrone*, 874 So.2d at 1052; *Wood*, 852 So.2d at 709; *Ex parte Davis*, 721 So.2d 685, 689 (Ala.1998). "A State agent acts beyond authority and is therefore not immune when he or she 'fail[s] to discharge duties pursuant to detailed rules or regulations, such as those stated on a checklist.'" *Giambrone*, 874 So.2d at 1052 (quoting *Ex parte Butts*, 775 So.2d 173, 178 (Ala.2000)).

*Ex parte Estate of Reynolds*,  946 So.2d 450, 452 (Ala. 2006).

No evidence in the record suggests that Jennings acted "maliciously,

fraudulently, in bad faith, or beyond his authority"other than Ogburia's bald

assertions to this effect in his brief.  (Doc. 64 at 54.)  However, arguments from counsel in briefs are not evidence, *see Skyline Corp. v. N.L.R.B.*, 613 F.2d 1328, 1337 (5th Cir. 1980) and, under *Reynolds*, Ogburia bears the burden of proof in demonstrating malice or bad faith.  Moreover, the undisputed evidence is that Jennings did not personally participate in post-termination due process claims and he had no causal connection to the defective post-termination due process procedures.

Consequently, the Jennings's motion for summary judgment on the basis of state-agent immunity is due to be **GRANTED**. No evidence in the record suggests that Jennings acted willfully, maliciously, or in bad faith.[8] Thus, Defendants are entitled to summary judgment on Count Four of the Amended Complaint, alleging a violation of the Alabama Constitution.  In reaching this conclusion, the Court assumes, without deciding, that Alabama recognizes a private right of action to sue for damages based on the Alabama Constitution.

## V.    CONCLUSION

In light of the Court's preceding discussion, the Court finds that the Defendants' Motion for Summary Judgment is due to be **GRANTED IN PART** and **OTHERWISE DENIED**.  Specifically, the motion is due to be granted as to all of

---

[8]  The Court has previously determined that all of the individual defendants are entitled to state-agent immunity to the extent that they are sued in their official capacities for state law violations.  (Doc. 19 at 10.)

Ogburia's pre-termination due process claims based on 42 U.S.C. § 1983, and as to all of Ogburia's claims against Jennings in his individual and official capacities for post-termination due process claims.  In all other respects, the motion for summary judgment is due to be denied.

Plaintiff's Motion for Partial Summary Judgment is similarly due to be **GRANTED IN PART** and **OTHERWISE DENIED**.  Ogburia's motion is due to be granted as to his post-termination due process claims brought under 42 U.S.C. § 1983 against the members of the Board of Trustees in their official capacities.  In all other respects, the motion is due to be denied.  An order consistent with these findings will be entered.

**DONE** and **ORDERED** this the 20th day of April, 2009.


**VIRGINIA EMERSON HOPKINS**
United States District Judge

54